Lawyers are very observant. I imagine you have observed that there are two judges here on the TV screen. Our great friend and colleague Judge Jolly cannot join us today, so he will be listening in and we'll see what else he does while he's listening in. We have one case of the morning, United States v. Cheryl Kissentaner, and I can be corrected. So, Ms. Garcia, you may proceed. Thank you, Your Honor. May it please the Court. My name is Victoria Garcia-Cross and I'm appearing on behalf of Ms. Cheryl Kissentaner. Ms. Kissentaner was a tax preparer who was charged with aiding and assisting in the preparation of false tax returns. She was not convicted after her first trial, which ended in a hung jury. She was convicted at her second trial on seven of the original 15 counts charged against her. And so the issues on appeal concern the admission of certain portions of testimony by IRS agent Greg Meyer, the admission of 404B evidence, the reasonableness of the sentence, and the restitution order, but because the parties agree about the remedy with respect to the restitution order, I plan to focus my arguments on issues 1 through 3. And I'll actually start with the preserved 404B issue. The district court reversibly erred by admitting extrinsic evidence of Ms. Kissentaner filing her own personal tax returns late and evidence concerning her preparer ID number. That evidence doesn't satisfy the two-part test that this court set forth in Beecham because it wasn't relevant to an issue besides Ms. Kissentaner's character and because it was far more prejudicial than it was probative. And I'll start with relevance. So the late filed tax returns weren't relevant because they didn't involve conduct that was similar to Ms. Kissentaner's charged offenses. This court has said that to be relevant to an issue of intent or knowledge, the past bad act has to involve conduct that's similar and, as this court has said, involving the same state of mind as the charged offenses. And this conduct didn't rise to that level. Agent March testified at Roa 2263 that Ms. Kissentaner filed her 2012 through 2017 tax returns late, only filing them around 2019 or 2020. And so there was no testimony that she put false information in her personal tax returns, and the government didn't present any evidence of the tax returns themselves. So the evidence that was presented to the jury showed negligence at most. It didn't show that same criminal intent to defraud. Does the government think that's, I mean, I guess I'll ask them, they think that's relevant to her PTIN? Am I getting that right? Your Honor, I think that was a separate portion of evidence that they believed was, that they asserted was relevant at the trial. That's her tax preparer number? Yes, Your Honor. She has to have that in order to do tax preparation for other people? Precisely, Your Honor. Okay, and if she didn't file the returns, is the idea that she couldn't have a PTIN? That was the argument, but the evidence concerning the preparer ID number also wasn't relevant, because with respect to that issue, there wasn't even sufficient evidence that a bad act had even occurred. So Agent March testified at Roa 2264 that, as Your Honor said, a tax preparer ID number, a PTIN as they referred to it, is required to be able to file taxes on behalf of somebody else. It has to be renewed yearly, and in the initial application and in any renewals, there needs to be the certification that you're tax compliant, or in other words, you're up to date on your personal taxes. This is one number that stays with the taxpayer? Yes, Your Honor. Tax preparer, taxpayer? Yes. It seems to me, it took me a while to get there, and I may not be in the right place, but it does seem to me that the government's argument, and I'm not sure how much it was expressed to the jury, is that knowing she did not really have this number, still filing returns to argue that it was all innocent to the mistakes that appeared in returns, you put that on the foundation of she's already knowingly breaking the law by using a number that is not either current or does not exist in some technical way. What about that? That was the argument, Your Honor. Was that the argument presented that way to the jury? Essentially. Better, probably, than I just said it, but anyway. It was essentially that, Your Honor, but that was improper, because this court has said that a past bad act, extrinsic evidence like this, has to involve the same state of mind, and the agent didn't testify that Ms. Kissentaner put false information in her applications for her preparer ID. That testimony was equally consistent with Ms. Kissentaner's, say, negligently failing to renew the preparer ID. She could have been truthful in her application and then just failed to renew. Well, failed to renew means filing her own return. Failing to renew the preparer ID number, Your Honor. Right, but it comes, renewing it means that you have filed your own return and therefore you can properly certify when you're filing somebody else's return. My understanding, Your Honor, is that there is a separate application process for renewing the preparer ID number in particular, and so the testimony was that there's this preparer ID number that's required, you separately apply for a renewal, and you have to certify in that separate renewal that you're tax compliant. But that testimony was equally consistent with Ms. Kissentaner, just correctly applying for the renewal in the beginning when she was tax compliant and then failing to renew, perhaps because she didn't know. How would she not know that she hadn't filed tax returns in those years? Not know that she needed to renew the preparer ID, Your Honor. But even if the court isn't persuaded with respect to relevance, this evidence shouldn't have come in because it was overwhelmingly prejudicial. It had minimal probative value, because this case was really all about whether Ms. Kissentaner knew that the information she was putting in those tax returns for her customers was false. And so the government presented evidence to prove their point about that issue. They didn't really need this extrinsic evidence about Ms. Kissentaner's personal tax situation. That evidence didn't come in in the first trial? Correct, Your Honor. It didn't come in in the first trial, and that's kind of illustrative of the harmlessness issue as well. Well, I imagine that's not the only change from the first trial. Your Honor, there were a few changes. The significant ones were the admission of this extrinsic evidence and then the admission of testimony by Agent Meyer about Ms. Kissentaner's state of mind and the kind of vouching testimony, which I'll get to in the next... The Diaz issue. Yes, Your Honor, yes, precisely. But the point is... Not your most favorable development. Actually, Your Honor, I believe that case helps us. Good work. So finish up this first issue. Certainly, Your Honor, thank you. So the point is that Ms. Kissentaner, this extrinsic evidence about Ms. Kissentaner's personal situation was overwhelmingly prejudicial, and the government used it to show Ms. Kissentaner's bad character, essentially. They led with it in closing. That was the very first thing they mentioned in closing. They talked about it again in rebuttal. They started their rebuttal by slow clapping the defense team, saying Ms. Kissentaner was using smoke and mirrors to deceive the jury, and then they looped it back around to the prepare ID number, saying that because she wasn't tax compliant, she wasn't lawfully allowed to prepare taxes in the first place. And that evidence, as I mentioned before, wasn't harmless because this wasn't a slam dunk case. There wasn't overwhelming evidence. The government presented seven witnesses total. That was five taxpayers, customers of Ms. Kissentaner, two IRS agents. There wasn't external corroboration for what Ms. Kissentaner... Excuse me, for what the customers were saying. There wasn't a successful undercover sting. There wasn't a confession by Ms. Kissentaner. In fact, the government didn't even audit the customers to figure out whether the information in the forms was false or not or what it should have been. And so this case really hinged on the credibility of those customers, and this extrinsic evidence could have been the thing that tipped the scales. But moving to the next issue that Your Honor's expressed interest in... I'm asking about those customers of hers. What was the correlation between the witnesses that were called and the charges in the indictment? How many of the improper forms was she charged with for which there were no witnesses as to those individual forms? Did everybody... I mean, I don't know how many counts there were, how many different fraudulent forms were charged. Did they call witnesses on all the alleged fraudulent forms? They did, Your Honor. The way that it broke down was that they had three sets of witnesses. They were either individual customers or couples that were filing jointly as married folks. So three sets of witnesses, and for each tax return, each count corresponded with one year of their tax returns, if that makes sense. And so for Rennell Anthony, for example. For any returns that the government charged with fraudulently prepared, there were witnesses for those taxpayers. That taxpayer was a witness. Yes, Your Honor, but you've hit upon precisely the issue, which is that for each count, it boiled down to a credibility contest. Understood. And as far as the first trial was concerned, was that done there too? I'm sorry, I didn't hear you, Your Honor. The first trial, was that also the way the witnesses lined up with the counts in the indictment? Precisely, Your Honor. It was exactly the same. But the issue was that at the first trial, they didn't put in this extrinsic evidence, and they also didn't present the evidence from IRS Special Agent Greg Meyer in the same way, which brings me to the second point, which is that the district court also plainly erred by allowing Agent Greg Meyer to vouch for the credibility of other government witnesses, the customers, and by also allowing him to address the state of mind of Ms. Kissentaner. I'll address all the prongs of plain error. So with respect to clear plain error, the district court clearly erred by allowing Agent Meyer to testify in a way that vouched for the credibility of the other witnesses. This government, this court has said. I read that testimony this morning. The testimony you're referring to is where the agent testifies about each customer and says, yes, I reviewed that. It was false. This was false. False. That's what you're talking about. Yes, Your Honor. And he did that at the very beginning of the trial. It was before the government had presented any witnesses. And so he said, as Your Honor explained, for example, for Olga Rengel at row 1788, he said, I've reviewed these forms and I've identified the tax fuel credit as false. The schedule A is false. The schedule C is false. Later on, so there's no objection, obviously. And then later on, and then I read the cross-examination. The cross-examination says, well, you're just taking their word for it, right? Does that undermine your argument a little bit? It actually supports it, Your Honor. It shows that he was presenting evidence that he had not himself independently investigated. He was relying entirely on statements from other people. But he was presenting that to the jury as if it was true. He essentially was saying to the jury, I believe them. And that makes this case very similar to United States v. Price, where this court said that it was error for a government witness, an IRS agent, to testify about the tax liability of the defendant based on statements from other people saying expressly that he was doing that because he believed them. It's essentially the same. It also was clear error for the district court to allow Agent Meyer to talk about Ms. Kissentaner's state of mind. So the testimony in this regard started out appropriately. Agent Meyer began by talking about his own investigation and his background. But then it crossed the line into impermissible territory when he started talking about the undercover investigation. So he said there had been an undercover sting. It had failed. And then he listed a reason for it to have failed. He said because tax preparers won't prepare false returns for other people if the customer doesn't come in saying they were referred by an existing customer. The court says, in your experience, what is that? And he says because they know they're preparing returns incorrectly and they're nervous. And so that's akin to a statement that all preparers in Ms. Kissentaner's situation know they're preparing returns incorrectly and they're nervous. Well, you know this probably by heart. Let me read it. The court actually. So the question for the prosecutor is failure of the undercover. Did that surprise you? Not at all. And then the court asks why not. Well, first we have a generic answer. Undercover operations fail for a few reasons. Then it gets specific as to your client. On that initial form she was asking for a referral. Then it gets global again. Oftentimes the return preparer and the rest of the answer. So it does seem to me when you're looking at Diaz, there's a bit of both in here. Why isn't the overall answer really looking at oftentimes this is what happens? And if it does, if that's the proper focus, isn't that consistent with Diaz? It would be consistent with Diaz if that was what the expert testified. But as Your Honor pointed out, he was switching back and forth between talking about Ms. Kissentaner and the failed operation there and talking about why a tax preparer would be able to get around an undercover operation. So he was essentially making a comment, not that most tax preparers think this way, but that all tax preparers in her situation think that way. And that is not like Diaz. And another way that this is not like Diaz is— One of those specifics he needed to say why the rest was relevant, and the specific one that you may be most concerned with, though you'll take any of them if we'll buy it, on that initial form she was asking for a referral. So that laid the foundation for the relevance of what he then said thereafter about oftentimes because he's going to focus on the need for a reference or referral. So it's almost inevitable in testimony like this that you have to say why you're going to talk about this particular general approach to things because that's the general approach, that's the specific approach that the defendant used. Well, Your Honor, Agent Meyer was more specific later on in his testimony at Roe v. 1817 when he said he was asked, based on the undercover video, is it clear that the defendant knew how to prepare tax returns correctly? And he said yes. So there he was specifically opining about Ms. Kissentaner's state of mind, and that is clearly over the line that the justices in Diaz drew. So this was clear error, and it affected Ms. Kissentaner. It is—I may not understand your point on the testimony, but you seem to be saying testimony that this particular defendant wasn't incompetent is prejudicial? Your Honor, I see my time has elapsed. May I respond to the question? Answers to judges' questions go beyond time and time. Thank you, Your Honor. Yes, Your Honor, it was impermissible because it— not because it was prejudicial per se, but because the agent was expressing testimony and opining about Ms. Kissentaner's state of mind. That is precisely what this Court has said that a witness cannot do, and that is what he was doing. Did you have a question? Thank you, Counsel. Thank you, Your Honor. Good morning. May it please the Court. Anna Kaleri on behalf of the United States. I'd like to start with the 404B evidence topic, if that's okay, just to clear up a few facts. So there were two applications that Ms. Kissentaner had to do. One was the PTIN, and the other one is the EFIN. The EFIN is the electronic filing number. That's the one that she—sometimes it was valid, sometimes it wasn't, sometimes it had expired. That wasn't necessarily the focus of what the government was discussing when we put in evidence that she didn't fill out the forms correctly. We were more focused on the PTIN, and that's the tax preparer identification number. That was a form that she had to fill out every single year. And one of the questions on that form, in order to get the number to be able to file these tax returns, was whether or not she was up to date in her own tax filings. And so every year from 2012 to 2017, she alleged on this form that she was, and she received the tax preparer identification number. So that is what the focus was on when that evidence was introduced. Agent March was the one who testified about this. It was not challenged by the defendant. No other evidence was put on. Therefore, by a preponderance of the evidence, the government established that this was actually the case, and therefore it was properly before the jury. So that's how that was proved before the jury that the bad acts occurred. By evidence, the government proved what? That she— Made it proper for the jury to hear it. Correct. That she did not file her tax returns between 2012 and 2017. So that's the testimony you're talking about, that she had not filed her own return, was proven. Well, correct. That's one part of it. The second part is that she therefore filled out, she also filled out the forms for the PTIN. And she, part of that was she answered the questions incorrectly to fraudulently obtain the PTIN number. And the question that she answered incorrectly was whether or not she was up to date on her federal tax filings. So that's how that evidence came into, came before the jury. And it is relevant to knowledge and intent. It has to go to evidence other than character. And here really was knowledge and intent. And in my brief, I list a number of reasons why it was proper. But I think the most essential reason is that it was there to establish Kiss and Tanner's preparation of false tax returns were intentional. They weren't due to mistake or accident. As the very basis she used to file those tax returns, the falsely obtained PTIN was based on fraud. You can commit the crime, though, without, with a valid PTIN, right? Pardon? You have a valid PTIN. Yes. You can still commit this crime. Absolutely. And that was an interpretation the jury could have— So how is having the false PTIN relevant at all to whether you commit the crime or not? It doesn't matter. But it goes to your intent, the lack of mistake, the fact that she fraudulently obtained this. When you say lack of intent, you're referring to the underlying crime here, preparing false tax returns? So one of the issues here, I think, kind of moving back to this, the main issue here in the case was who provided the false information and who knew about it. There was no question here that this information was false. And so here we had two agents testify and five tax preparers who testified. So the question was, did they provide the information? Did Kissentaner know this information was false or did this come from Kissentaner's side? So this goes to show the lack of mistake. The defense put forth by Kissentaner was that she had no idea that this all came from the taxpayers. And this information goes to show that, no, this was part of her scheme. This was part of her plan. Counsel may be just asking what Judge Duncan did in a less clear way, but it does seem to me what you're talking about, she was willing to commit the crime of being a tax preparer, filing for a tax preparer number improperly, illegally. But I'm still having trouble seeing the correlation, the reason, a willingness to commit that crime. I don't know if it's a criminal offense or a civil offense to have falsely filled out that form. I mean, it sounds to me like you're saying if she's willing to commit one crime, that helps support the intent that she's willing to commit the crime of falsely filling out the returns. Isn't that sort of what you're arguing? Well, but I think it's part and parcel. She couldn't have gotten to the ultimate crime without having the PTIN. But she also could have filled out her own returns and gotten it and committed it and had a proper number and still be falsely filing returns, falsely preparing returns. Absolutely, she could have, but she didn't in this case. In this case, it was part of her plan. Is it a crime to prepare to be a tax preparer without a valid PTIN? I don't believe so, but from my limited understanding of both the civil and the criminal part of this, I don't believe you can actually file it. You need it to electronically file the tax forms. So she couldn't have filed anything without a PTIN. She needed both the EFIN and the PTIN in order to be able to file the forms that she prepared for her clients. What is your response to counsel on the argument, I've got to figure out a way of not saying your friend on the other side because I don't know if you're friends or not. Counsel opposite. Counsel opposite. The one who says you're wrong. What is your response to the idea that the argument that the state of mind with respect to the PTIN is different from the state of mind with respect to the underlying crime? And so therefore, evidence with respect relating to the PTIN really shouldn't have come in under Beecham. They both go to show the fraud that was committed in order to be able to. Well, what's the state of mind for the underlying crime? The state of mind to. For the crime that she's convicted of. To falsely prepare, to prepare the tax returns with false information. Okay, is that the state of, so. It is the same state of mind for the PTIN. She applied for the PTIN with false statements. Okay, so if she's saying, all right, I'm in compliance with my tax obligations, yes, so it's false. Correct. Okay, so that's it. She lied in both. And, you know, the second part of the balancing test has the four prongs, right, the need, the similarity, the time and instruction. The need obviously was high. This case is about knowledge and intent. We have the agent, we have the taxpayers, and we don't have any adverse statements from Kiss and Tanner. So it wasn't essential, but it was obviously very relevant. Are we on plain error with respect to this issue? I'm sorry? Are we on plain error with respect to this issue? No, the second issue, the 404B was preserved.  Okay, correct. So we do have a harmless error argument. It's the same for, the harmless error argument is essentially the same as whether it affected her substantial rights in the first argument. Let me ask you one of the points made by, I hope she's your friend, but whoever she is, that there were very few differences between the first trial with the hung jury and the second trial. Certainly can't do too much useful in trying to figure out why one jury did one thing and another jury did the other. But what would you say the differences were in the evidence between the first and the second trial? So I think I'll preface all of this by saying that after the first trial and after the second trial, the parties did not talk to the jury, so how they chose to decide how they did is unknown to anyone. And I think there are a few factual differences between the first and second trial. So she was charged with 15 counts. Three counts were dismissed prior to the first trial, so she was tried actually on 12. By the time we got to the second trial, it was actually nine, because three of the other ones were dismissed because that witness was unavailable for trial. So we were down to nine. She was acquitted of two and ultimately convicted of seven. In the meantime, it was tried by a different trial team. There were different prosecutors who came in. The new prosecutors reviewed all of the evidence and the witnesses, and each prosecutor has a different way of styling things and trying a case. Obviously, you learn from the first trial to the second trial. So I think going in to say this specific piece of evidence caused the difference between the two trials is kind of a fool's errand there. I can understand your reluctance to answer my question, but I get the foundation. You said it was a fool's errand. You've got a long time, so that's fine. Apologies, I didn't mean that to be offensive. I will say in terms of the trial, yes, there was testimony that came in in the second trial that didn't come in in the first trial, but I think that is part and parcel of a new prosecutor interviewing the witnesses and realizing what else is out there and what can be done. One thing I will point out for the two trials, and if you look in pure speculation on my part, but I will say it anyway because I think it's backed up by the evidence that came in, when we look at the counts that she was convicted of and the ones that she wasn't convicted of, one of the things here, in Texas we have no state tax, and a number of these taxpayers actually filed a credit for state tax. And the two that she was acquitted on, there wasn't any evidence that a state tax was filed. So I think that's one of the things, for example, that the jury looked at. And I think when we're talking about whether or not these, I would argue they are not errors, but if this Court were to find that any of these things cross the line, one of the things that we can look at is the fact that the jury actually didn't take the agent's testimony wholesale. They actually looked at the evidence, and they acquitted her of two of the crimes. So they were going through the tax returns, the testimony of the agents, the testimony of the taxpayers, and going through to find out what exactly happened here and which she should be guilty of. And they acquitted her on two. And so I think that that's something, when we look at the agent testimony, we can say they didn't just buy it wholesale. What's your harm? I know, I guess, back to the 404B evidence, what is your argument? Just remind me about harmless error with respect to that. So, again, the evidence is overwhelming. We had the two agents. We had the five witnesses. Okay. We had the tax returns that were actually in evidence. They had them. They looked over them. When we go through all of that, would you like to turn to the agent Myers' testimony and those two parts, or do you not? We've got all morning. Okay. You're the only case. Whoa, wait. I'm sorry. You're right. We can stay on 404B, or we can go to the first part if there's any questions. Let's hear about 404B. Okay. So the false information in the tax returns, Special Agent Myers' testimony about that, I think to put it in perspective, he testified for, in the record, it's 100 pages. It consisted of about two of them. When we look at the evidence, he went through his testimony. He went through all of his investigation. He went through the tax returns. He went through his interviews. He did speak with the witnesses, the taxpayers, and he said, this is what they told me. He was cross-examined on that later and said, this is what they told me, that these were the things that were false. So I think that one of the cases that Kissantana relies on in Griffin, and in Griffin, the ultimate holding there was, we hold, therefore, that the district court abused its discretion in allowing the government to utilize Martin as an overview witness to testify as to issues in dispute. I think the main difference here is this was not in dispute. No one disputed that this was false information in the tax returns. In her opening statement, counsel said, so everybody here agrees that the tax forms we're going to be dealing with in this case were wrong. In closing, she said, I told you at the beginning, we all agree these forms are false. Yeah, you said earlier. So the other side says, well, no, no, what this came down to is a credibility determination about these customers, right? But you say no. Instead, what was the gist of the trial then, if it's not that? Well, but I think she's right. It was a credibility issue. And I think when you're looking at this evidence here, so the agent comes up and says, I interviewed them. They told me this was false. He was cross-examined, and he said, yes, my information comes from them. Those taxpayers then testified, this information is false. They were subject to cross-examination. The question wasn't whether the information was false. Everyone agreed on that. The question is, where did the false information come from? Was this something that Kiss and Tanner came up with? Was this something that the taxpayers came up with? Was this a joint enterprise? I guess what's the purpose of asking then the agent after the overview testimony about these customers and whether it was false or not? What was the purpose of those questions? One of the elements is that there were false statements in there. Okay. But that wasn't a contested issue. Yes, it's an element, but it wasn't a contested issue. The contested issue was knowledge and intent, and the question was whether it came from the taxpayers, whether it came from Kiss and Tanner, or whether it was a combination of both, and whether Kiss and Tanner knew about this. When you say it wasn't contested, I guess the elements of the offense that were given to the jury that the jury had to sign off on would have had that as an element that they had to find. Nothing in closing argument, nothing backed away from that opening statement that would have made it more of an issue by the end of trial? No. No. And, in fact, in her closing argument, counsel again said, I told you at the beginning we all agreed that these forms are false. Okay. What about Mr. Diaz? Ah, yes. So I believe, Your Honor, you went through it, and the questions that you asked counsel were very close to what my arguments would be here. Yes. That was not my purpose to. . . And that seems to be the line that seems to give everyone pause. But I think that line is simply focusing the issue and the question on the referral part of it. And I believe this was proper because he spoke generally about undercover operations. There's the word oftentimes. There wasn't the use of the word all. In fact, in Diaz, it said, an expert's conclusion that most people in a group have a particular mental state is not about the defendant. And, therefore, it doesn't violate 704B. And here, simply the statement on the initial form she was asking for a referral is simply focusing the witness on the testimony about the request for a referral. Well, this is an important development potentially in a small part of evidentiary law that the Supreme Court has given us. I think we have to be cautious on how we start applying it in our circuit. Yes, Your Honor, and I understand that. And I apologize. I'm going to cite a case that's not in my brief. But it came up when I was looking at Diaz and how this Court has applied it. But it is in line with how this Court has typically applied the rule of this type of testimony before. In the case, I'm certainly going to follow it, 20HA, if this Court would like. The case is United States v. Portillo. It's 969F3D144. It's from 2020. And it says there the agent testified. It was a drug trafficking gang case. And the agent testified about typical characteristics of the president of the gang. And the defendant was the new president of the gang. And this Court held that it was fine because he talked about typical characteristics rather than specifics to the actual defendant. So I think Diaz is in line with a long line of cases out of this Court. All right, counsel. Anything else for us? No. Thank you very much. Thank you. Just a few points in rebuttal, Your Honors. We have all morning. Thank you, Your Honor. The government's made a number of arguments about the 404B issue. And so this Court asked what was the bad act with respect to Ms. Kisentaner filing her own personal tax returns late or the evidence related to the preparer ID number. That's the central question. The government's claim is that the bad act is that she lied when applying for the preparer ID number or when renewing it. But the issue is that there is just simply not evidence supporting that. There wasn't evidence that was presented to the jury supporting that. The evidence was given in the abstract by Agent March. Agent March simply testified that a preparer ID number is required to file taxes, and it needs to be renewed yearly, and in that application, you need to certify that you're tax compliant. But there wasn't evidence put on about what Ms. Kisentaner put in her forms. It wasn't clear that any agent had even looked at her application forms, and there were no application or renewal forms that were submitted to the jury. And so that evidence is equally consistent with Ms. Kisentaner negligently failing to renew her preparer ID. The government makes arguments about how you need to have a valid ID to be able to file. That wasn't presented to the jury. There's no evidence about that. And so based on what we have, the evidence was consistent with negligent conduct, and that's not enough to be relevant under Beecham. Could you speak to the harmless error? Certainly, Your Honor. This court asked about that and asked about the difference in the trials. The central two differences were the introduction of this extrinsic evidence and the switch in how Agent Meyer testified. At the first trial, they had him testify last. So he didn't preview all of the things that the jury was going to hear. He didn't preemptively call things false based on statements from other witnesses he testified last. He didn't testify about Ms. Kisentaner's state of mind. He said there was an undercover operation, it failed, and that sometimes happens, and he stopped. And so the government lost that trial, and then at the second trial, they changed their strategy. They had him testify first, vouching for the credibility of the subsequent government witnesses, and they introduced this extrinsic evidence. The government, in its argument, has raised an issue about how there were credits claimed about or there were allegations made in the tax returns about people getting credit for state taxes, and that was suspicious, and perhaps that's why some of the customers formed or why Ms. Kisentaner was found not guilty with respect to a few of the customers' forms. That evidence was consistent between the first trial and the second trial. More importantly, we don't need to show, so it's the government's burden to show that this error was harmless with respect to the preserve 404B issue, and we don't need to show that there is certainty that these things affected the conviction. You don't have to prove the negative.  And there is a reasonable probability that in the district court, the jury convicted Ms. Kisentaner, not because they were persuaded about her guilt, but because they were persuaded she was a person of bad character, a kind of tax scofflaw who didn't follow the tax laws, and they convicted her because they believed that she needed to be punished for that. She was, as the government said in rebuttal, a magician who was trying to deceive the jury. And so this error wasn't harmless, and we ask, unless the court has any further questions, we ask the court to vacate the conviction and remand for a new trial. Thank you. Thank you, counsel. Thanks to both of you for giving us a fuller explanation of this case. After this one case, we are at recess until tomorrow at 9 a.m.